IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

TRACY L. GIVAN,          *

                          *

   Plaintiff,          *

                          *

vs.                 *        Civil Action No. 11-00508-B

                          *

CAROLYN W. COLVIN,[1]   *

Commissioner of Social Security,   *

                          *

   Defendant.       *

## ORDER

Plaintiff, Tracy L. Givan (hereinafter "Plaintiff"), brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, *et seq*.  On October 12, 2012, the parties consented to have the undersigned conduct any and all proceedings in this case.  (Doc. 20).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

## I.   Procedural History

Plaintiff filed an application for disability insurance benefits on June 5, 2006, and alleged that her disability commenced on May 15, 2000.  (Tr. 226-30).  Plaintiff also filed an application

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

for supplemental security income benefits on June 5, 2006.  (Id. at 233-39, 259-62).  Plaintiff's applications were denied initially on September 15, 2006 (id. at 97-101), and she timely filed a Request for Hearing on November 14, 2006.  (Id. at 104).  At the hearing conducted on August 13, 2008, Plaintiff requested a continuance so she could retain an attorney.  (Id. at 74).  Her request was granted, and the hearing was rescheduled for December 3, 2008.   Plaintiff and her attorney attended the rescheduled administrative hearing, which was held before Administrative Law Judge David R. Murchison (hereinafter "ALJ").  (Id. at 47-71).  On December 31, 2008, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 77-89).  Plaintiff sought review before the Appeals Council (hereinafter "AC"), and on May 8, 2009, her request was granted.  (Id. at 90-94).  The AC vacated the ALJ's decision and remanded the case for further consideration of the clinical assessment of pain form dated September 28, 2008 and completed by treating physician, Dr. Ruben Belen[2].  (Id. at 92-93).  Subsequently, administrative hearings were conducted by the ALJ on September 8, 2010 and December 15, 2010. (Id. at 25-33, 34-46).  Plaintiff attended both hearings with counsel and presented testimony.  (Id.).   On February 7, 2011, the ALJ issued an opinion again finding that Plaintiff is not disabled.[3]  (Id. at 11-19).  The AC denied plaintiff's request for review on July 2, 2011; thus, the ALJ's decision dated February 7, 2011 became the final decision of the Commissioner.  (Id. at 1-3).  Having

---

[2] The ALJ was also directed to determine whether Plaintiff's work as a housekeeper in 1998 and 1999 was performed at the gainful activity level, to determine whether evidence from a medical expert to clarify the nature and severity of Plaintiff's impairments was necessary, to evaluate Plaintiff's mental impairment in accordance the special technique described in 20 CFR 404.1520a and 416.920a, to further consider Plaintiff's maximum residual functional capacity and to obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. (Tr. 93)

[3] Plaintiff requested that her claim for disability insurance benefits under Title II of the Act be dismissed and that only her Title XVI claim for supplemental security income be considered as her insured status expired on March 31, 2006 for purposes of Title II.  (Tr. 37-38).

exhausted her administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).
The parties agree that this case is now ripe for judicial review and is properly before this Court
pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.     Issues on Appeal

A.     Whether substantial evidence supports the ALJ's RFC assessment?

B.     Whether the ALJ erred by rejecting Plaintiff's subjective
complaints of pain and the side effects of her prescribed
medications?

## III.    Factual Background

Plaintiff was born on June 29, 1965, and was 45 years of age at the time of her last
administrative hearing.  (Tr. 226).  Plaintiff completed the eleventh grade in high school and
subsequent thereto,  earned her GED.  (Id. at 50).  Plaintiff has worked as a housekeeper/cleaner
in the hotel industry and as a cook in the food service industry.  (Id. at 51-52, 250).

At the administrative hearing conducted on December 3, 2008, Plaintiff testified that she
last worked in the hotel industry as a housekeeper in 2000, and that due to her lower back pain,
she is  now precluded her from performing such work.  (Id. at 51-53).  Plaintiff also testified that
the lower part of her back "hurt[s] all the time," and that the pain goes "down the back of [her]
legs." (Id. at 53).  According to Plaintiff,  she has "degenerating joints disease" and a bulging
disc in her lower back for which she takes pain medication and muscle relaxers.  (Id. at 53).  At
the September 8, 2010 administrative hearing, Plaintiff provided further testimony regarding her
back pain and stated that "[m]y back pain is what's causing my problems."  (Id. at 39).
According to Plaintiff, Dr. Schnitzer sent her to physical therapy where she was given home
exercises for her back, but the exercises did not help her.  (Id. at 30-31).  At both the 2008 and
2010 hearings, Plaintiff testified that none of her physicians have told her that she might need

surgery on her back.  (Id. at 40, 44-45, 53-54).

With respect to her daily activities, Plaintiff testified that she spends her time sitting around her house, and visiting at her father's house and with other family members.  She also testified that she reads the newspaper, shops, and drives.  (Id. at 30, 41-42, 56-57).    Plaintiff further testified that her medications cause her to slur her speech and to experience drowsiness, and as a result, she has to take extended naps.  (Id. at 56, 62-63).

## IV.    Analysis

### A.    Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[4]  Martin v. Sullivan, 894 F. 2d 1520, 1529 (11th Cir. 1990).  A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Sewell v. Bowen, 792 F. 2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, F. 2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F. 2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion.").   In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision.

---

[4] This Court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F. 2d 996, 999 (11th Cir. 1987).

Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B.**   **Discussion**

An individual who applies for Social Security disability benefits must prove his disability.  20 C.F.R. §§ 404.1512, 416.912.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven her disability.[5]  20 C.F.R. §§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since October 15, 2000, and that she has the severe impairments of vertigo, lumbar degenerative disc disease, lumbar spondylosis and radiculitis, myofascitis, and major

---

[5] The claimant must first prove that he or she has not engaged in substantial gainful activity.  The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work.  Jones v. Bowen, 810 F. 2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history.  Id.  Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history.  Sryock v. Heckler, 764 F. 2d 834, 836 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F. 3d 1224, 1228 (11th Cir. 1999).  See also Hale v. Bowen, 831 F. 2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

depressive disorder.  (Tr. 13).  The ALJ also found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id. at 14).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform a range of light work.  (Id. at 15).  The ALJ specifically found that Plaintiff can sit, stand, and walk for six hours each in an eight-hour workday, that she can lift up to twenty pounds occasionally and ten pounds frequently, that she can bend, squat, crawl, and climb frequently and that she can reach continuously.  (Id.).  The ALJ also concluded that Plaintiff cannot work around dangerous heights or machinery and that she cannot climb ladders, ropes, or scaffolds.  (Id.).  He further concluded that Plaintiff can understand, remember, and carry out short, one and two step instructions and tasks on a frequent basis, and that with respect to detailed instructions, she can understand, remember and carry out those instructions on an occasional basis.  (Id.).  The ALJ also noted that "the drastic reduction from the full range of very heavy work to a mere range of light work accommodates in part [Plaintiff's] mild to moderate pain."[6]  (Id.).

The ALJ then determined that Plaintiff is capable of performing her past relevant work (hereinafter "PRW") as a cleaner.  (Id. at 19).  The ALJ stated, "[i]t is a light unskilled job that requires no climbing, crawling, feeling, talking, hearing, near or far acuity, depth perception, accommodation or balancing; does require frequent reaching and handling; occasional stooping, kneeling, crouching, and fingering[;] [and] [a]s unskilled work, it does not require mental abilities in excess of her RFC."  (Id.).  Thus, the ALJ concluded that Plaintiff is not disabled.

---

[6] In the ALJ's first decision, which was reversed by the AC, the ALJ concluded that Plaintiff could lift up to 50 pounds occasionally or 25 pounds frequently, and that she was capable of performing medium work. (Tr. 84)

(Id.).

### 1. **Medical Evidence**

The relevant medical evidence of record reflects that on October 25, 2001, Plaintiff sought treatment at Mobile Mental Health for depression.  (Id. at 366).  Dr. Ronald Finch examined Plaintiff.  Plaintiff reported that her problems with depression began in 1986 following the death of her son, and that she was in good physical condition.  (Id.).  Dr. Finch diagnosed Plaintiff with major depression, and prescribed Zoloft and therapy.  (Id. at 365-66).  The records reflect that Plaintiff returned to Mobile Mental Health sporadically from 2001 to 2005 and was treated with Zoloft and Trazodone.[7]  (Id. at 347-66).

On March 22, 2005, Plaintiff sought treatment at the Mobile County Health Department for back pain from "no known injury."  (Id. at 377).  She was examined by Dr. Ruben Belen, who diagnosed her with back strain.  Dr. Belen prescribed Flexeril, Darvocet, and "bed rest" for her back pain and refilled her Ativan prescription for anxiety.[8]  (Id. at 378).  Plaintiff returned to Dr. Belen on June 3, 2005, and reported chest and back pain. Dr. Belen diagnosed Plaintiff  with hypertension, back pain, chest pain, and gastroesophageal reflux disease. He prescribed Neurontin, Darvocet Flexeril, Inderal, Hydrochlorothiazide, and Prevacid.[9]  (Id. at 376).  Dr.

---

[7] Zoloft (or Sertraline) and Trazodone are antidepressants.  Both work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html#skip,      http://www.nlm.nih. gov/medlineplus/druginfo/meds/a681038.html.

[8] Flexeril (or Cyclobenzaprine) is a muscle relaxant.  See http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a682514.html.  Darvocet is a combination of acetaminophen and propoxyphene used to relieve mild to moderate pain.   See http://www.nlm.nih.gov/medlineplus/drug info/meds/a601008.html.   Ativan (or Lorazepam) is in a class of medications called benzodiazepines and is used to relieve anxiety.  It works by slowing activity in the brain.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html.

[9] Neurontin (or Gabapentin) is used to help control certain types of seizures and also to relieve pain.   See   http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html.   Inderal and

Belen saw Plaintiff again on January 11, 2006 for continued problems with low back pain.  He ordered an x-ray of Plaintiff's spine, which proved to be "normal."  (Id. at 373, 383).  Plaintiff returned to Dr. Belen at regular intervals from January 2006 through October 2006 with reports of back and leg pain. Dr. Belen consistently noted that Plaintiff was in no acute distress and that her physical examinations were normal, except  for tenderness in her back.  (Id. at 367-68, 371-74, 444-49).   Dr. Belen continued to refill Plaintiff's prescriptions for Neurontin, Darvocet, Ativan, Inderal, Lipitor, and Hydrochlorothiazide, but he did not suggest any other treatment. (Id.).

Following Plaintiff's application for social security disability benefits in June 2006, the Agency referred her to Dr. Damon Ann Robinson, Ph.D, for a consultative psychological exam on August 7, 2006.  (Id. at 226-230, 389).  Plaintiff reported to Dr. Robinson that she was having anxiety attacks and multiple medical problems,[10] but denied any suicidal or homicidal ideation or hallucinations.  (Id. at 391-392).   Plaintiff informed Dr. Robinson that she has worked in housekeeping, food service, and as a cashier, that none of her jobs lasted more than two years, that she last worked in 2002, and that she was terminated for "not going to work" and because of problems with her bosses due to her "attitude."  (Id. at 390).  With respect to Plaintiff's activities of daily living, she reported to Dr. Robinson that she sits around the house, visits her parents, spends time with friends, cooks, cleans, shops, handles money, bathes and feeds herself independently, reads, and drives herself.  (Id. at 390, 392).

Dr. Robinson noted that Plaintiff was cooperative, that her speech was normal, that her

hydrochlorothiazide (HCTZ) are used to treat high blood pressure.  See http://www.pdrhealth. com/drugs/inderal;  http://www.everydayhealth.com/drugs/hydrochlorothiazide.   Prevacid (or Lansoprazole) is used to treat gastroesophageal reflux disease.  See http://www.nlm.nih.gov/med lineplus/druginfo/meds/a695020.html.

[10] Plaintiff reported to Dr. Robinson that her medical problems were chronic back pain, hypertension, and an overactive thyroid for which was taking Synthroid.  (Tr. 389-90).

thought processes were logical and well organized, and that her judgment and insight were adequate. (Id. at 391-92). Dr. Robinson estimated Plaintiff's level of intellectual functioning to be in the average range and opined that Plaintiff could " manage disability funds independently if granted." (Id. at 392). Dr. Robinson also noted that Plaintiff exhibited no unusual body movements or gait disturbance. (Id. at 391). She diagnosed Plaintiff with "major depressive disorder, recurrent, mild", and opined that her prognosis was "good" and that she would likely benefit from outpatient mental health treatment. (Id. at 392).

On September 13, 2006, Dr. Ellen Eno, Ph.D., an Agency psychologist, completed a mental RFC assessment. She opined that Plaintiff is moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods. In all other areas of mental functional capacity, she opined that Plaintiff is "not significantly limited." (Id. at 429-30).

Plaintiff returned to Dr. Belen at the Mobile County Health Department on October 25, 2006 and January 12, 2007, for refills of her medications and a referral for an MRI. Dr. Belen observed that Plaintiff was in no acute distress, was having no symptoms while on her medications, and was "not feeling tired or poorly." (Id. at 441-44). On January 24, 2007, Dr. Belen referred Plaintiff for an MRI of her lumbar spine. (Id. at 451). The MRI showed that Plaintiff has a loss of the normal signal intensity of the 5-1 intervertebral disc with mild bulging of the disc and degenerative change of the facet joints, "some very mild" bilateral neuroforaminal narrowing, and mild degenerative change of the facet joints bilaterally at 3-4 and 4-5.[11] (Id.). In his office notes the following month, Dr. Belen noted Plaintiff's history of

---

[11] The report also noted ovarian cysts on Plaintiff's left ovary. (Tr. 451).

chronic low back pain and stated that the MRI showed a "bulging disc at L5/S1 level with degenerative changes." (Id. at 440). He again noted, as he had in previous months, that Plaintiff was in no acute distress, that she was not feeling tired or poorly, and that her physical examination was normal. (Id. at 440-41). Dr. Belen continued Plaintiff's usual medications and added Lortab[12] and Ibuprofen. (Id.). Dr. Belen saw Plaintiff again on April 3, 2007. He continued her medications. (Id. at 438).

From November 16, 2007 through March 10, 2008, Plaintiff sought treatment for her low back pain from the Franklin Primary Health Center (FPHC). She was prescribed Lortab, Toradol, Neurontin, and Zanaflex.[13] (Id. at 478-85). The records from these visits reflect that Plaintiff was in mild to moderate distress.[14] (Id.).

On January 17, 2008, Plaintiff also began seeing Dr. Edward Schnitzer, a physical medicine and rehabilitation physician with Coastal Neurological Institute. (Id. at 468). Plaintiff reported to Dr. Schnitzer that she had fallen approximately seven years earlier, but suffered no fracture, and that her injury had resolved until approximately one to two years earlier when she developed recurrent lumbar pain with radiation down the left lower limb to the calf. (Id.). Plaintiff also reported that she had persistent aching and throbbing lumbar pain, which she rated as 8 out of 10. Plaintiff indicated that the pain was made worse by standing, bending, and most activities. (Id.). Dr. Schnitzer noted that Plaintiff's 2007 MRI indicated "no significant disc

---

[12] Lortab is a combination of hydrocodone and acetaminophen used to relieve moderate to moderately severe pain. See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/.

[13] Toradol (or Ketorolac) is in a class of medications called NSAIDs and is used for short-term relief of moderately severe pain. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html#skip. Zanaflex (or Tizanidine) is used to help relax certain muscles in the body. See http://www.ncbi. nlm.nih.gov/pubmedhealth/PMHT0012442/.

[14] Dr. Gladwyn L. Murray was the treating physician on these occasions. (Tr. 478-85).

herniation or stenosis." Dr. Schnitzer also noted that Plaintiff had been treated with narcotic analgesics for pain control and that she had not tried physical therapy, electrodiagnostic testing, or epidural steroid injections in regard to her symptoms. (Id.).

Upon examination, Dr. Schnitzer found that Plaintiff's range of motion in her neck was within normal limits in all directions, that her motor function in her upper and lower extremities was 5/5, that her sensory function in her upper and lower extremities was intact, that her reflexes were normal, that she had no focal atrophy in her upper limbs, that her tone was intact throughout her upper and lower limb muscles, that she had no calf tenderness or swelling, that her heel/toe walk was satisfactory, and that her straight leg raise was negative. (Id. at 469). With respect to range of motion in her back, Dr. Schnitzer noted that Plaintiff had some discomfort on extension and lateral bending bilaterally, as well as some bilateral low lumbar tenderness and tightness. (Id. at 469-70). Dr. Schnitzer noted that Plaintiff's posture was erect and without significant gait deviation and that she was in no acute distress. (Id.). His impression was "[d]egenerative disc disease lumbar spine," "[c]hronic low back pain with radicular and myofascial features," "[s]ome clinical evidence suggestive of lumbar facet arthropathy," and "[s]uperimposed myofascial pain syndrome."[15] (Id. at 470). Dr. Schnitzer referred Plaintiff for physical therapy and recommended further testing to rule out radiculopathy and neuropathy. He also advised her that one of his goals was to minimize the amount of narcotic analgesics that she was taking. (Id.).

Plaintiff saw Dr. Schnitzer on February 14, 2008 for a follow up examination. His treatment notes reflect that the pain in Plaintiff's back and legs was "tolerable" and "adequately

---

[15] Myofascial pain syndrome is a chronic pain disorder in which pressure on sensitive points in the muscles (trigger points) causes pain in seemingly unrelated parts of the body. This is called referred pain. See http://www.mayoclinic.com/health/myofascial-pain-syndrome/DS01042.

controlled with prescribed medication," that her medications had "no significant side effects," that she was able to sleep, clean house, do errands, walk outside the house, feed herself, walk in the house, cook, work, bathe/shower, go to the bathroom, and take care of her personal grooming.  (Id. at 464).  Dr. Schnitzer continued Plaintiff 's medications and physical therapy. (Id.).  The following month, on March 13, 2008, Dr. Schnitzer noted that Plaintiff had no abnormalities in her gait, that her muscle strength in her lower lumbar spine was 5/5 throughout, with tenderness at L-4 and L-5, that her pain was reasonably well controlled with medications,[16] and that she had not shown significant improvement with physical therapy.  (Id. at 466-67).  Dr. Schnitzer continued her medications and physical therapy.  (Id.).

On March 18, 2008, the Agency referred Plaintiff to Dr. William Crotwell, a physician with Alabama Orthopaedic Clinic, P.C., for a consultative physical examination.  (Id. at 434). Plaintiff reported to Dr. Crotwell that she was experiencing back pain radiating down her left posterior thigh, with no numbness or tingling and no loss of control of her bowel or bladder. (Id.).  Plaintiff stated that her pain was 70 percent back pain and 30 percent left leg pain, with increased pain with walking and standing.  (Id.).  Plaintiff reported that an MRI taken in February 2007 showed lumbar degenerative disc disease but no ruptured disc.[17]  (Id.).  Plaintiff also reported problems with high blood pressure, high cholesterol, and thyroid.  (Id.).  With respect to Plaintiff's activities of daily living, she told Dr. Crotwell that she cooks, but does not clean, that she drives locally, and that she can walk one or two blocks.  (Id.).  Plaintiff reported her current medications as Zanaflex, Lortab, Inderal, Hydrochlorothiazide (HCTZ), Synthroid,

---

[16] On this occasion, Plaintiff complained of excessive daytime sleeping.  (Tr. 462).

[17] Dr. Crotwell noted that he was unable to obtain a copy of the actual MRI report itself.  (Tr. 434).

and Lipitor.[18]

As a result of Dr. Crotwell's physical examination of Plaintiff, he made the following findings:  Plaintiff ambulates without assistance.  She was able to take her shoes and socks off, crossing her legs past 90 degrees without any difficulty.  Her toe and heel walk were normal. Her forward flexion was only about 50 percent "with a very poor attempt," and her extension was 30 percent "with a very poor attempt" "after being able to flex and extend completely before that." (Id.).  There was no tenderness or spasm.  (Id.).  Dr. Crotwell further noted that Plaintiff had normal reflexes and normal sensory function.  (Id. at 435).  In addition, her motor function was 5/5.  (Id.).  He noted that Plaintiff's straight leg raise was "inconsistent."  (Id.).  Dr. Crotwell also reported that x-rays of Plaintiff's lumbar spine revealed "fairly normal lumbar spine, normal lumbar curve with some mild osteoarthritis."  (Id.).  His impression was "history of lumbar strain with no evidence of any radiculopathy."  (Id.).  Dr. Crotwell concluded: "I think this patient could carry out medium, could definitely carry out light and could definitely carry out sedentary. She could definitely work an eight hour workday.  I see no basic orthopedic problem with this patient." (Id.).

Dr. Crotwell also completed a Physical Capacities Evaluation form in which he opined that Plaintiff could sit, stand, and/or walk for a total of eight hours during an eight hour workday, and that Plaintiff could do each function for no more than two hours at a time.  (Id. at 436).  He further found that she could continuously lift as much as twenty-five pounds and frequently lift fifty pounds, that she could continuously carry as much as twenty pounds and frequently carry as much as twenty-five pounds, that she could use both of her hands for simple grasping, pushing and pulling of arm controls, and fine manipulation.  (Id.).  In addition, he opined that Plaintiff

_____

[18] Lipitor is in a class of drugs called "statins" used to lower cholesterol.  See http://www. pdrhealth.com/drugs/lipitor.

could use both of her feet for repetitive movements such as pushing and pulling of leg controls, that she could frequently bend, squat, crawl, and climb, and that she could continuously reach. (Id.).  Dr. Crotwell also opined that Plaintiff has no restrictions with regard to exposure to marked changes in temperature and humidity or to dust, fumes, and gases, and that she is mildly restricted with respect to moving machinery and driving automotive equipment and is moderately restricted with regards to unprotected heights.  Dr. Crotwell concluded, "[t]he patient could perform moderate, light and sedentary work."  (Id.).

The record reflects that on September 29, 2008, Plaintiff was again seen by Dr. Belen at the Mobile County Health Department.  In his treatment notes, Dr. Belen observed that Plaintiff was not feeling tired or poorly and she did not appear to be in acute distress.  (Id. at 570-71).  In addition, he noted that her physical examination was normal except that her neurological motor exam "demonstrated dysfunction".  He further noted that Plaintiff had good use of her upper extremities and she had no sensory abnormalities.  (Id. at 571).  Dr. Belen recommended continuing Plaintiff on her current medications.  (Id.).  Also, at Plaintiff's request, Dr. Belen completed a Clinical Assessment of Pain form.  (Id. at 438, 495, 570).  In the form, Dr. Belen opined that Plaintiff's pain was present to such an extent as to be distracting to the adequate performance of work activities.  (Id. at 495).  He further opined that Plaintiff's medications could cause side effects, which would impose some limitations upon her but not to such a degree as to create a serious problem in most instances.  (Id.)[19].

Throughout the remainder of 2008, 2009, and 2010, Plaintiff saw Dr. Schnitzer for treatment of her back pain.[20]  Plaintiff continued to report low back pain.  Her physical

---

[19] Based on the record, it does not appear that Plaintiff sought any further treatment from Dr. Belen after September 29, 2008.

[20] Plaintiff also sought treatment at Franklin Primary Health Care for back pain on February 19,

examinations were normal, except "tightness" or "tenderness" in the lumbar region was occasionally noted. (Id. at 455, 497-502, 507-53, 583-87, 596-605). Plaintiff's gait, posture, and the strength in the lower extremities were consistently noted as normal. (Id.). Dr. Schnitzer continued to prescribe narcotic pain medications for Plaintiff,[21] and Plaintiff routinely reported no negative side effects from her medications. (Id.).

On September 21, 2010, the Agency referred Plaintiff to Dr. Todd Elmore, a neurologist with Neurology Child and Adult, P.C., for a consultative physical examination. (Id. at 589). Plaintiff reported to Dr. Elmore that her problems with her back began in 2001 when she fell and injured her back. (Id.). She also reported pain in her back that ran down both of her legs, but primarily her left leg, and that she felt unsteady and had difficulty ambulating long distances. (Id.). Dr. Elmore noted Plaintiff's 2007 MRI showed "some diffuse disk disease, but nothing too out of the ordinary." (Id.). He further noted that Plaintiff has never had any back surgery or even an epidural but that "[s]he takes quite a bit of pain medication."[22] (Id.).

Upon examination, Dr. Elmore found that Plaintiff had no abnormalities in appearance and was in no acute distress. (Id. at 590). Plaintiff's head, ears, eyes, nose, throat, and cardiovascular system were noted as normal. (Id.). Upon examination of Plaintiff's neurological

---

2009, and October 27, 2009. (Tr. 573-74, 581).

[21] Dr. Schnitzer prescribed MS Contin, Percocet, and Mobic for pain. (Tr. 496-502, 507-53, 583-87, 596-605). MS Contin (or Morphine) is an opiate (narcotic) analgesic used to relieve moderate to severe pain. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682133.html. Percocet is a prescription painkiller containing hydrocodone and oxycodone and is used to treat extreme pain. See http://www.nlm.nih.gov/medlineplus/ency/article/007285.htm. Mobic (or Meloxicam) is a nonsteroidal anti-inflammatory drug (NSAID) and is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis. See http://www.nlm.nih.gov/medline plus/druginfo/meds/a601242.html.

[22] Plaintiff reported to Dr. Elmore that she was taking Percocet, MS Contin, Synthroid, Trazodone, and Lexapro. (Tr. at 589). Lexapro (or Escitalopram) is an antidepressant. See http://www.nlm.nih. gov/medlineplus/druginfo/meds/a603005.html.

15

system, Dr. Elmore found her cognitive function to be normal; cranial nerves were normal, symmetric, and in tact; motor strength was full and equal in the upper and lower extremities; tone was normal; no atrophy or fasciculations were noted; sensory function showed no deficits; reflexes were symmetric in all extremities, with no pathologic reflexes elicited; and Plaintiff's gait was "somewhat slow and unsteady, but nonspecific." (Id.). With regard to Plaintiff's musculoskeletal system, Dr. Elmore observed that Plaintiff "has a limited range of motion in her lumbar spine and perhaps slightly so in her cervical spine." (Id.). He also noted that Plaintiff "has some mild pain to straight-leg raising." (Id.). Dr. Elmore's overall impression was that Plaintiff suffered from chronic low back pain with some radicular complaints (left worse than right), depression, and chronic opioid dependence. (Id. at 591). He stated, "I performed an NCV and EMG[23] of her bilateral lower extremities. This was entirely normal." (Id.). Dr. Elmore concluded: "The patient's complaints are entirely subjective in nature. She does have some mild degenerative disk disease in her back, but not much else. She has an entirely normal NCV and EMG. She probably could work, particularly a sedentary job which fell within the confines of the physical capacities evaluation I filled out for her. Any limitations she has are based on her subjective complaints." (Id.).

Dr. Elmore completed a Physical Capacities Evaluation in which he opined that Plaintiff could sit for four hours at a time, stand for three hours at a time, and walk for one hour at a time. (Id. at 595). In addition, he opined that Plaintiff could sit for a total of seven hours during an eight-hour day, stand for a total of four hours during an eight-hour day, and walk for a total of two hours in an eight-hour day. (Id.). Dr. Elmore further opined that Plaintiff could

---

[23] Nerve conduction velocity (NCV) is a test to determine how fast electrical signals move through a nerve. Electromyography (EMG) is a recording from needles placed into the muscles and is often done at the same time as an NCV test. See http://www.nlm.nih.gov/medlineplus/ency/article/003927.htm.

continuously lift and carry ten pounds, frequently lift and carry twenty pounds, occasionally lift and carry twenty-five pounds, and never lift and carry greater than twenty-five pounds. (Id.). He also opined that Plaintiff could perform repetitive actions such as simple grasping, pushing and pulling of arm controls, and fine manipulation with her left and right hands. (Id.). In addition, he opined that Plaintiff could use both of her feet for repetitive movements as in pushing and pulling of leg controls, and that she could frequently reach, occasionally bend, crawl, and climb, but never squat. (Id.). He further opined that Plaintiff has no restriction in activities involving unprotected heights, moving machinery, marked changes in temperature and humidity, driving automotive equipment, and exposure to dust, fumes, and gases. (Id.). Finally, Dr. Elmore remarked that "[a]ll complaints due to subjective pain complaints." (Id.).

The following day, September 22, 2010, Dr. Schnitzer ordered additional x-rays and another MRI of Plaintiff's lumbar spine. (Id. at 608-09). The x-rays showed an essentially "normal" lower back, with normal mobility, normal sacroiliac joints, no evidence of spondylolisthesis, no evidence of focal lumbar disc space loss, no vertebral fracture, and "no definite pars intra-articularis defect." (Id. at 608). The impression of the reviewing physician, Dr. Mark Goddard, was "[n]o focal disc height loss, vertebral fracture, or spondylolisthesis." (Id.). Dr. Goddard also reviewed the MRI of Plaintiff's lumbar spine and reported the following impression: "right lateral recess and proximal right intraforaminal disc protrusion with mild narrowing at these locations at the L5-S1 disc level. There is contralateral mild left foraminal encroachment at L5-S1 due to bulging disc margin and left facet hypertrophy." (Id. at 609). Dr. Goddard found that the disc protrusion was "mild," that the disc narrowing was "mild," that the central canal was satisfactory throughout the lumbar levels, and there was no spondylolisthesis or abnormal lumbar marrow signal. (Id.).

On September 29, 2010, Dr. Schnitzer examined Plaintiff and reviewed the MRI taken on September 22, 2010.  Dr. Schnitzer observed that the MRI showed a L5-S1 protrusion and bilateral facet changes.  (Id. at 602).  His findings upon examination of Plaintiff were  "normal" in all respects, including 5/5 on strength tests, negative straight leg raise, normal gait, normal posture, and no muscle spasm.  (Id. at 602-03). Dr. Schnitzer's treatment notes reflect that these same findings were observed during his examination of Plaintiff on November 29, 2010.   Dr. Schnitzer again noted, as before, that Plaintiff was tolerating her medications[24] well and that "[n]o side effects [were] reported."  (Id. at 596-97).  Dr. Schnitzer's notes also reflect that he continued Plaintiff's prescriptions for Mobic, MS Contin, and Percocet, and encouraged her to continue with the home exercise program.  (Id. at 600).  Additionally, Plaintiff requested that he complete a physical capacity form; however, he advised her that he could not accurately do so. (Id.).

On December 9, 2010, Plaintiff returned to Franklin Primary Health Center and obtained a Clinical Assessment of Pain from a physician who had treated her years earlier, Dr. Otis Harrison.  (Id. at 27-28).  On the form, Dr. Harrison opined that Plaintiff's pain "is frequently present and found to be intractable and virtually incapacitating to this individual" and that Plaintiff would be "totally restricted" and "unable to function at a productive level of work as a result of [her] medications."  (Id. at 610).  Dr. Harrison prescribed Methadone[25] for her back pain.  (Id. at 616).  On January 6, 2011, Plaintiff returned to Dr. Harrison, and he prescribed

---

[24] Plaintiff's medications included Mobic, MS Contin, and Percocet. (Tr. at 599).

[25] Methadone is an opiate (narcotic) analgesic used to relieve moderate to severe pain.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html.

Lortab and Methadone for her back pain and Klonopin[26] for anxiety.  (Id. at 611-16).

    2.    **Issues**

    **a. Whether substantial evidence supports the ALJ's
RFC assessment?**

In her brief, Plaintiff argues that the ALJ erred in finding that she has the residual functional capacity (hereinafter "RFC") to perform a range of light work and that she could perform her past relevant work as a cleaner/housekeeper.  (Doc. 13 at 4, 6).  Plaintiff maintains that the ALJ's assessment is not supported by the medical opinion of any treating or examining medical source.  (Id.).  Plaintiff also takes issue with the ALJ's rejection of the opinions of her treating physicians, Dr. Belen and Dr. Harrison, regarding their assessments of Plaintiff's pain and the effects of her medications on her ability to work.  (Id. at 9-10).  Additionally, Plaintiff argues that the ALJ failed to elicit VE testimony to determine whether there are other jobs Plaintiff can perform with RFC.  Having reviewed all of the evidence in this case, the Court finds that the ALJ did not err in rejecting the opinions of Drs. Belen and Harrison and that the ALJ's decision is supported by substantial evidence.

Turning first to the ALJ's rejection of the opinions of two of Plaintiff's treating physicians, the undersigned observes that it is well-established that the testimony of a treating physician must be given substantial or considerable weight unless good cause is shown to the contrary.  Indeed, the ALJ may discount any treating physician's report where it is not accompanied by objective medical evidence, is wholly conclusory, or is contradicted by objective medical evidence.[27]  Crawford v. Commissioner of Soc. Sec., 363 F. 3d 1155, 1159

---

[26] Klonopin (or Clonazepam) is in a class of medications called benzodiazepines and is used to relieve panic attacks.  See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html.

[27] "When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the: (1) length of the treatment relationship and

(11th Cir. 2004) (citations and internal quotations omitted).  In Green v. Social Sec. Admin., 223 Fed. App'x 915, 923 (11th Cir. 2007) (unpublished), the Eleventh Circuit affirmed the district court's finding that the ALJ's RFC assessment was supported by substantial evidence where the ALJ "devalue[d]" the treating physician's opinion set forth in a Physical Capacities Evaluation after finding that it was inconsistent with the medical evidence and plaintiff's testimony.  Id., 223 Fed. App'x at 923-24.  After rejecting the treating physician's opinion, the ALJ formulated the plaintiff's RFC based solely on the medical records and other evidence presented, without any physician's opinion concerning the plaintiff's remaining capabilities.  Id., 223 Fed. App'x at 923-24.  The court found that the ALJ had "good cause" to discredit the treating physician's opinion and noted that, "[a]lthough a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ."  Id., 223 Fed. App'x at 922-23 (citing 20 C.F.R. §§ 404.1513, 404.1527, 404.1545)).

In this case, as noted above, Dr. Belen, one of Plaintiff's treating physicians, opined on September 29, 2008, that Plaintiff's pain was "present to such an extent as to be distracting to the adequate performance of work activities" and that her medications "can cause side effects which impose some limitations" upon her "but not to such a degree as to create serious problems in most instances." (Tr. 495).  While Dr. Belen began treating Plaintiff in 2005, the record reflects that Dr. Belen had not treated Plaintiff for nearly a year and a half, on September 29, 2008, when

the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence and explanation supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the pertinent medical issues; and (6) other factors that tend to support or contradict the opinion."  Weekley v. Commissioner of Soc. Sec., 486 Fed. App'x 806, 807-08 (11th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)).   In this case, the ALJ gave no weight to the opinions of Drs. Belen and Harrison, finding that they were conclusory and unsupported by the record.  (Tr. 17-18).

Dr. Belen examined Plaintiff and completed the pain assessment.  (Id. at 438).  Dr. Belen's previous treatment records from 2005 through April of 2007 provide no support for his opinion.  Rather, those records reflect a 2006 x-ray showing that Plaintiff's lumbar spine was completely "normal," as well as physical examinations showing only occasional "tenderness" in the lumbar spine area, repeated pain ratings of two out of ten, and repeated notations that Plaintiff was in "no acute distress."  (Id. at 367, 371-78, 383, 440-49).  In addition, the 2007 MRI ordered by Dr. Belen shows only "mild" bulging disc at the L5/S1 level, "mild" degenerative change of the facet joints, and "some very mild" bilateral neuroforaminal narrowing.  (Id. at 451).  Further, Dr. Belen's treatment notes consistently document that Plaintiff was not feeling tired or poorly and that she was not having problems while on her prescribed medications.  These treatment notes clearly contradict Dr. Belen's conclusory opinion regarding the intensity of Plaintiff's pain and the effect of her medications.  (Id. at 438-446).  Indeed, even Dr. Belen's September 29, 2008 treatment notes reflect that Plaintiff's physical examination was normal, except that her neurological motor exam "demonstrated dysfunction", and she had good use of her upper extremities and had no sensory abnormalities.  The only treatment recommended by Dr. Belen was that Plaintiff continue on her medications.

Likewise, Dr. Harrison rendered an opinion about Plaintiff's pain and medications although he had not treated her for years.  (Id. at 27-28).  Plaintiff testified at the December 15, 2010 administrative hearing that Dr. Harrison had treated her "years ago", and that she had "walk[ed] in to see him" just one week before her hearing to have him to fill out a Clinical Assessment of Pain Form.  (Id.).  It appears that before preparing the pain form on December 9, 2010, Dr. Harrison examined Plaintiff and noted that the exam was unremarkable except that Plaintiff reported to him a pain level of 8 in her lumbar spine area.  (Id. at 615).  The record is

devoid of any prior treatment records from Dr. Harrison or of other information upon which Dr. Harrison relied in concluding that Plaintiff's pain "is frequently present and found to be intractable and virtually incapacitating" and that Plaintiff would be "totally restricted" and "unable to function at a productive level of work as a result of [her] medications." (Id. at 610

The opinions and conclusions set forth in the Clinical Assessment of Pain forms completed by Drs. Belen and Harrison were not based on contemporaneous treatment records and, in Dr. Belen's case, were inconsistent with his own previous treatment records. Moreover, both opinions are inconsistent with the remaining medical evidence in this case, as well as the evidence of Plaintiff's activities of daily living, as detailed below. Therefore, the Court finds that the ALJ had good cause for rejecting Dr. Belen's and Dr. Harrison's opinions regarding Plaintiff's pain and the side effects of her medications.

The Court also finds that Plaintiff's medical records provide substantial evidence to support the ALJ's RFC assessment that she could perform a range of light work, including her past relevant work as a cleaner/housekeeper. While the medical evidence shows that Plaintiff has a "mild" bulging disc that causes tenderness and tightness in her lower back, it also shows that Plaintiff has "no significant disc herniation or stenosis," no spondylolisthesis, no fracture, and no abnormal lumbar marrow signal. (Id. at 468, 608-09). In addition, Plaintiff has no problem ambulating, no problem with her posture or gait, and in virtually all respects, has "normal" objective findings on all of her physical examinations. (Id. at 455, 470, 497-502, 507-53, 583-87, 596-605). None of Plaintiff's physicians has ever recommended surgery. To the contrary, her treatment has consisted almost entirely of narcotic analgesics and limited physical therapy. Plaintiff's physicians have, with few exceptions, repeatedly noted that her pain was

"adequately controlled with prescribed medications," that she was in no acute distress, and that her medications have "[n]o significant side effects." (Id. at 443, 464, 466-67, 497, 507, 596-97).

The consultative physical examinations of Drs. Crotwell and Elmore likewise support the ALJ's RFC assessment.  Dr. Crotwell found Plaintiff's physical examination to be normal, and observed that she had no difficulty crossing her legs, removing her shoes and socks, or walking on her toes and heels.  (Id. at 434).  He opined that she could sit, stand, and/or walk for a total of eight hours during an eight hour workday, that she "could carry out medium, could definitely carry out light work and could definitely carry out sedentary [work and she] could work an eight hour workday.  (Id. at 435-36).  Dr. Crotwell concluded, "I see no basic orthopedic problem with this patient."  (Id. at 435).

Similarly, Dr. Elmore found "some diffuse disk disease, but nothing too out of the ordinary."  (Id. at 589).  He also found virtually every aspect of Plaintiff's physical examination to be "normal."  The only anomalies noted were that Plaintiff's gait was "somewhat slow and unsteady, but nonspecific," that she had a limited range of motion in her lumbar spine and "perhaps slightly so" in her cervical spine," and that she has "some mild pain to straight-leg raising."  (Id. at 590).  He stated unequivocally: "The patient's complaints are entirely subjective in nature.  She does have some mild degenerative disk disease in her back, but not much else.  She has an entirely normal NCV and EMG.  She probably could work, particularly a sedentary job which fell within the confines of the physical capacities evaluation I filled out for her.  Any limitations she has are based on her subjective complaints."  (Id. at 591).  Based on those subjective complaints, Dr. Elmore opined that Plaintiff could sit for a total of seven hours during an eight-hour day, stand for a total of four hours during an eight-hour day, and walk for a total of two hours in an eight-hour day.  (Id. at 595).

Although Plaintiff argues that the ALJ's RFC, including the restriction that Plaintiff can sit, stand, and walk for six hours each in a total eight-hour work day, is flawed because it does not mirror the assessments of either Dr. Elmore nor Dr. Crotwell, the physical assessments prepared by both physicians, although not identical, place Plaintiff's functional capacity at the light work level or higher.  The ALJ, as trier of fact, was responsible for resolving any conflicts within the opinions of the medical providers and consultants and formulating Plaintiff's RFC finding.   In this case, that is exactly what the ALJ did.   His finding that Plaintiff can sit, stand, and walk for six hours each in a total eight-hour work day is not inconsistent with Dr. Crotwell's assessment that Plaintiff can sit, stand and walk for two hours at a time, and that she is capable of working a eight-hour work day.  Further, although Dr. Crotwell opined that Plaintiff is capable of lifting up to fifty pounds occasionally, and Dr. Elmore placed Plaintiff's capacity for occasional lifting at twenty pounds, the ALJ properly reviewed the record evidence, and resolved the conflict by adopting the more restrictive lifting restrictions contained in Dr. Elmore's assessment based on the record evidence, including Plaintiff's documented history of mild degenerative disk disease in her back.  Accordingly, Plaintiff's contention that the ALJ's RFC assessment was flawed because it did not mirror the physical assessments of Dr. Crotwell or Dr. Elmore is without merit.

Plaintiff also argues that the ALJ's RFC assessment, as it relates to her mental limitations, is not supported by the opinion of a treating or examining physician.  The Court disagrees.   In determining Plaintiff's RFC, the ALJ found that Plaintiff can understand, remember and carry out only short, one and two step instructions and tasks on a frequent basis and detailed instructions only on an occasional basis.  (Id. at 15).  These mental limitations are supported by substantial evidence in the record, including the consultative psychological

examination of Dr. Robinson.  In her report, Dr. Robinson opined that Plaintiff's depressive disorder was "mild," noting that Plaintiff was cooperative, that her speech was normal, that her thought processes were logical and well organized, and that her judgment and insight were adequate, and that she had no suicidal or homicidal ideation or hallucinations.  (Id. at 389-92). Dr. Robinson concluded that Plaintiff's prognosis is "good" and that she would likely benefit from outpatient mental health treatment.[28]  (Id. at 392).  The ALJ's assessment regarding Plaintiff's mental limitations is also consistent with the opinion of Dr. Eno, who performed a State Agency psychological assessment in 2006 and found no severe mental impairment and only moderate limitations in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, and the ability to maintain attention and concentration for extended periods.  In all other areas of mental functional capacity, Dr. Eno found that Plaintiff was "not significantly limited."  (Id. at 393, 429-30).  The ALJ's RFC assessment related to Plaintiff's mental limitations is also supported by the testimony of the Vocational Expert who testified at Plaintiff's December 3, 2008, hearing that Plaintiff could perform her past relevant work as a cleaner, which is a light unskilled job, even with the mental limitations described in the ALJ's RFC assessment.  (Id. at 64-66).  Thus, the ALJ's RFC assessment, as it relates to Plaintiff's mental limitations, is supported by substantial record evidence in this case.

Further, the evidence related to Plaintiff's activities of daily living supports the ALJ's RFC assessment with respect to her physical, as well as her mental limitations.  The record shows that Plaintiff enjoys reading and is able to sleep, clean house, do errands, walk inside and outside of the house, walk one or two blocks,[29] feed herself, cook, work, bathe/shower, go to the

---

[28] Plaintiff has not sought treatment from a mental health professional since 2005, relying on her regular treating physicians for treatment with anti-depressants.  (Tr. 347).

[29] Plaintiff ambulates without assistance.  (Tr. 434).

bathroom, take care of her personal grooming, drive, visit family, shop, and handle money.  (Id. at 392, 434, 464).  This evidence further belies Plaintiff's claim that she has a disabling medical condition that would prevent her from performing a range of light work.

Finally, Plaintiff argues that following remand, the ALJ erred because he did not elicit new VE testimony to determine the jobs that she can perform with her revised RFC.  As noted supra, in his first decision, the ALJ determined that Plaintiff is capable of medium work, whereas, in the second decision, following remand, the ALJ determined that Plaintiff is capable of light work.  The record reflects that VE testimony was elicited during the administrative hearing immediately prior to the first decision; however, no VE testimony was elicited during the hearings conducted after remand.  The law is clear that "exclusive reliance on the grids is not appropriate either when [the] claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills."   Phillips v. Barnhart, 357 F. 3d 1232, 1242 (11th Cir. 2004).  Additionally, "[i]n order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Ingram v. Comm'r of Soc. Sec. Admin., 496 F. 3d 1253, 1270 (11th Cir. 2007) (quotation omitted).

In this case, following remand, the ALJ determined that Plaintiff could perform a range of light work, that she was limited to a position that required short, one and two step instructions, that she could not work around dangerous heights or machinery, and that she could not climb ladders, ropes or scaffolds.  Although the ALJ, having determined that Plaintiff has non-exertional impairments, did not elicit VE testimony, the undersigned finds, under the facts of this case, that said omission amounted to harmless error.

Harmless errors are those that do not prejudice the plaintiff and would not change the disability determination. Battle v. Astrue, 243 Fed. App'x 514, 522 (11th Cir. 2007) (citing Diorio v. Heckler, 721 F. 2d 726, 728 (11th Cir. 1983)); see also Ware v. Schweiker, 651 F. 2d 408, 412 (5th Cir. 1981) (remand would be a "wasteful corrective exercise" when "no further findings could be made that would alter the ALJ's determination" given the record as a whole).

The record reflects that in the administrative hearing conducted *before* the remand by the AC, the ALJ posed a question to the VE based on the physical assessment prepared by Dr. Crotwell.  The transcript reflects as follows:

Q:     Okay. Now in the next hypothetical, I'd like you to forget about that pain form. I'd like you to assume the mental limitation[30] that I gave you in the first hypothetical.   Then I'd like you to look at the form that was completed by Dr. Crotwell in Exhibit F, at page 3. And I want to make several modifications- - -

A.     Yes, sir.

Q.     - -to that.  Dr. Crotwell has put down a moderate limitation with respect to unpredicted heights and I'd like you to assume that she would have a complete limitation.  She would not be able to be exposed to unprotected heights, nor would she be able to be exposed to dangerous machinery, nor would she be able to engage in the climbing of ladders, ropes or scaffolds  And let me stop there and ask you, in the second hypothetical, whether you'd be able to identify any jobs in the regional or national economy that a person that profile could perform.

A.     Yes, Sir.  Based on that hypothetical, I would eliminate, I, I believe the kitchen helper and the fast food worker.  As she performed it, I, I think probably the grease vats could be

---

[30]  In the first hypothetical, the VE was asked to assume that the person would be limited to understanding, remembering and carrying out only short and simple one/two-step instructions and tasks. (Tr. 64).

considered dangerous machinery.

Q.      Okay.

A.      The, fry cooking, I think, would probably eliminate that position.   The cashier/checker and the cleaner/housekeeper, I believe, would probably remain.

Q.      Okay. With respect to the cleaner/housekeeper position, do you know how many of those exist in the regional or national economy?

A.      Classified nationally as light and unskilled, there's approximately 177,000.

(Tr. 64-66).

The VE's testimony, from the pre-remand hearing, reveals that although Dr. Crotwell's physical assessment contained a medium, as opposed to light, lifting/carrying weight restriction, the VE actually identified a job within the light work classification that someone with Plaintiff's education, age and non-exertional impairments is capable of performing.  Accordingly, while the ALJ did not question the VE during the subsequent administrative hearing, following remand, the record is clear that the "cleaner" job cited by the VE during the pre-remand hearing, and identified by the ALJ in the second decision, fully comports with Plaintiff's revised RFC and supports the ALJ's finding that Plaintiff is not disabled.  Thus, the ALJ's failure to question the VE at the subsequent hearing amounts to no more than harmless error. See Ramos v. Astrue, 2012 U.S. Dist. LEXIS 121070 (M.D. Fla. Aug. 27, 2012) ("[A]n ALJ's failure to include certain limitations in a hypothetical posed to the VE amounted to no more than harmless error where the VE provided testimony that those limitations would not affect the plaintiff's occupational base."); Luna v. Astrue, 2008 U.S. Dist. LEXIS 57179 (W.D. Okla. Mar. 27, 2008) (ALJ's decision supported by substantial evidence where VE identified jobs plaintiff was capable of performing in response to hypothetical that contained greater restrictions that those found in RFC); Walker

v. Astrue, 2008 U.S. Dist. LEXIS 13293 (M.D. Fla. Feb. 22, 2008) (failure to include restriction to simple repetitive tasks in the hypothetical question was harmless error where job identified by VE did not demand a mental capacity beyond that possessed by the plaintiff).

Based upon a careful review of the record, the Court finds that substantial evidence supports the ALJ's RFC assessment that Plaintiff could perform a range of light work, and that Plaintiff is capable of performing the cleaner position. Thus, Plaintiff's claims are without merit.

### b. Whether the ALJ erred by rejecting Plaintiff's subjective complaints of pain and the side effects of her prescribed medications?

Plaintiff also claims that the ALJ erred in improperly evaluating her testimony with regard to the severity of her pain and the side effects of her prescribed medications. (Doc. 13 at 15). Specifically, Plaintiff points to her testimony at the hearing on December 3, 2008, that she "[b]asically sit[s] around [her] house," that she is in constant pain, that the pain medications make her drowsy and sometimes make her slur her speech, that she has to sleep about six hours during the day because of her medications, and that her medications (namely Percocet and Zanaflex) lessen the severity of the pain and make her relax but do not completely take the pain away. (Tr. 56-63). The ALJ found that while Plaintiff's impairments could reasonably be expected to cause some of her symptoms, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. (Id. at 16). The Court agrees.

The medical evidence of record shows, as the ALJ found, that Plaintiff repeatedly reported to her physicians that her pain was being reasonably controlled by her medications and that she was experiencing no significant side effects.[31] (Id. at 443, 455, 464, 466-67, 497, 507,

---

[31] Plaintiff has not cited the Court to any instances in which she reported negative side effects of her medications to her physicians. The Court has found only two such instances, once in 2006

596-97).  In addition, her physical examinations were repeatedly and overwhelmingly "normal" (id. at 434-35, 440-46, 455-58, 469, 497-502, 507-53, 583-87, 590-91, 596-605), and the x-rays and MRIs taken of Plaintiff's lumbar spine showed no significant disc herniation, no stenosis, no spondylolisthesis, and only mild disc protrusion and narrowing.  (Id. at 383, 435, 451, 468, 589, 608-09).  In addition, Dr. Crotwell documented that Plaintiff put forth "a very poor attempt" when he was conducting his physical examination to determine her physical limitations.[32]  (Id. at 434).  This evidence, as well as the evidence of Plaintiff's activities of daily living recounted above, undermines Plaintiff's claims of debilitating pain and side effects from her medication.

The standard by which Plaintiff's complaints of pain are to be evaluated requires "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain."  Hubbard v. Commissioner of Soc. Sec., 348 Fed. App'x 551, 554 (11th Cir. 2009) (quoting Holt v. Sullivan, 921 F. 2d 1221, 1223 (11th Cir. 1991)).  "This standard can be satisfied by a claimant's subjective testimony if that testimony is supported by medical evidence."  Id. (citing Foote v. Chater, 67 F. 3d 1553, 1561 (11th Cir. 1995)).  The Eleventh Circuit has also held that the determination of whether objective medical impairments could reasonably be expected to produce the pain was a factual question to be made by the Secretary and, therefore, "subject only to limited review in the courts to ensure that the finding is supported by substantial evidence."  Hand v. Heckler, 761 F. 2d 1545, 1549 (11th Cir. 1985), vacated on

---

when Plaintiff told Dr. Robinson that her medications made her feel "sleepy" and a second time in 2008 when Plaintiff complained of excessive daytime sleeping.  (Tr. 390, 462).

[32]  Specifically, Dr. Crotwell stated: "Forward flexion was only about 50 percent with a very poor attempt and extension 30 with a very poor attempt, after being able to flex and extend completely before that."  (Tr. 434).

other grounds and reinstated sub nom. Hand v. Bowen, 793 F. 2d 275 (11th Cir. 1986).

Furthermore, the Social Security regulations specifically state:

> [S]tatements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled.

20 C.F.R. 404.1529(a) (2010).

In this case, Plaintiff has failed to direct the Court's attention to objective medical evidence that confirms the severity of her alleged pain, nor has she shown that her medical condition "is of such a severity that it can be reasonably expected to give rise to the alleged pain," as required in Holt.  Though her subjective complaints of pain are well documented in her medical records, no credible medical evidence suggests that her pain or the alleged side effects of the medication are of the disabling severity claimed by Plaintiff herein.

"[C]redibility determinations are the province of the ALJ," Moore v. Barnhart, 405 F. 3d 1208, 1212 (11th Cir. 2005), and a reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  Kalishek v. Commissioner of Soc. Sec., 470 Fed. App'x 868, 871 (11th Cir. 2012).  Based upon a careful review of all of the evidence in the record, the Court finds that the ALJ properly evaluated Plaintiff's credibility and clearly articulated his finding with regard to her pain and the side effects of her medications, and that credibility finding is supported by substantial evidence in the record.  Therefore, Plaintiff's claim that the ALJ erred in evaluating her testimony with regard to the severity of her pain and the side effects of her medications is without merit.

## V.   Conclusion

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income be **AFFIRMED.**

**ORDERED** this **27th** day of **March, 2013.**

/s/  **SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**